UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
MATTHEW DIRUZZA,  :
              Plaintiff,  :
   :
v.  :
   :  **OPINION AND ORDER**
THE VILLAGE OF MAMARONECK, New  :
York; Detective Sergeant CHARLES LANZA,  :  14 CV 1776 (VB)
Individually; Lieutenant DOMINICK  :
FALCONE, Individually; and Police Chief  :
CHRISTOPHER LEAHY, Individually,  :
              Defendants.  :
--------------------------------------------------------------x

Briccetti, J.:

In this Section 1983 action, plaintiff Matthew DiRuzza, a police officer, alleges his supervisors, defendants Charles Lanza, Dominick Falcone, and Christopher Leahy of the Village of Mamaroneck Police Department, implicitly encouraged Detective Richard Carroll to commit private acts of violence against plaintiff, thereby denying plaintiff his substantive due process rights under the Fourteenth Amendment.[1]

Now pending is defendants' motion for summary judgment. (Doc. #43). For the following reasons, the motion is GRANTED.

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

---

[1] Plaintiff's complaint alleges violations of both substantive due process and equal protection by these three defendants, as well as an intentional infliction of emotional distress claim under New York law against these defendants, as well as Det. Carroll and the Village of Mamaroneck. (Doc. #1). The Court dismissed the sole claim against Carroll on October 6, 2014, for failure to comply with the notice of claim requirement imposed by New York General Municipal Law § 50-e. (Doc. #30). The claims based on equal protection and intentional infliction of emotional distress, including the claim against the Village, were dismissed by stipulation on May 14, 2015. (Doc. #42). Therefore, although the docket erroneously reflects that the Village of Mamaroneck remains a defendant in this case, the only remaining claim is against Lanza, Falcone, and Leahy for violating plaintiff's right to substantive due process.

1

**BACKGROUND**

The parties have submitted briefs, statements of facts, and affirmations with supporting exhibits, which reflect the following factual background.

Plaintiff, defendants, and Det. Carroll all work for the Village of Mamaroneck's police department. Plaintiff is an officer, Lanza is a detective sergeant, Falcone is a lieutenant, and Leahy is the police chief. Defendants supervise both plaintiff and Carroll.

Plaintiff and Det. Carroll used to be partners and were close friends until 2009, when plaintiff became romantically involved with Carroll's then-estranged wife. Plaintiff claims defendants mishandled a series of altercations between plaintiff and Carroll between September 2012 and August 2013, which stemmed from plaintiff's relationship with Mrs. Carroll.

I.   The Fight

On Saturday, September 1, 2012, plaintiff and Mrs. Carroll had recently returned from their first vacation together as a couple. At about 9:30 a.m. that day, plaintiff was vacuuming his house when Det. Carroll came to the door and demanded to speak to him.

Plaintiff and Det. Carroll began to argue through plaintiff's screen door. Plaintiff told Carroll to leave, and to sign the divorce papers because Mrs. Carroll "wo[uld]n't go without medical [insurance] for a week," by which plaintiff meant he would marry her immediately. (Pl.'s Dep. at 59-60). Carroll responded, "you just took your last breath" and "you're going to die," to which plaintiff replied, "if I'm going to die, you're going to die," and "don't do that to your family." (Id. at 58-59). Carroll pushed through the screen door, breaking it, and entered plaintiff's house. Plaintiff picked up an aluminum walking stick and used it to strike Carroll. The two physically fought both inside the house and on the porch, prompting a neighbor to call 911. Plaintiff suffered a gash in his foot and abrasions to the back.

James Scarborough, a patrol officer of the Village of Mamaroneck Police Department, was the first to respond to the scene. Officer Scarborough called Lt. Falcone, the next-ranking officer, to investigate the incident. Det. Sgt. Lanza, the internal investigations officer, was also notified. Falcone and Lanza arrived at the scene, where Scarborough told them Carroll had committed burglary, assault, and criminal mischief.

II.     Investigation of the Fight

Plaintiff claims the subsequent investigation was flawed in several respects. Lanza told Scarborough not to draft an incident report, instead assigning the task to a different officer. Plaintiff claims portions of the incident report are inaccurate or misleading, such as the designation of Det. Carroll and plaintiff as mutual combatants, and labeling the incident "Prosecution Declined" instead of "Investigation Pending." (Plaintiff's Counterstatement Pursuant to Local Rule 56.1 ¶¶ 211, 213 ("Pl.'s 56.1 Statement")). Plaintiff also told Lanza and Falcone about a surveillance video of the incident that would be overwritten in seven days, but they did not recover it.

Although plaintiff initially wanted to press charges, he declined to do so after speaking with Lanza and Falcone. According to plaintiff, Lanza and Falcone promised to document the incident correctly, prevent similar incidents in the future, and inform Chief Leahy of the incident the following Monday. Carroll was not arrested or charged.

On September 13, 2012, plaintiff met with Chief Leahy. Plaintiff expressed fear and dissatisfaction about having to continue working with Carroll, and told Leahy the incident report was inaccurate because it said he and Carroll were mutual combatants. Leahy told plaintiff the neighbor had said in the 911 call that plaintiff was assaulting Carroll in the street. When plaintiff

3

said this was untrue, and asked for the incident report to be changed, Leahy told plaintiff to leave his office.

Leahy met with plaintiff and Carroll for between five and ten minutes, and told them both to stay away from each other. No disciplinary action was taken.

III.     The "Bully" Hat

On October 12, 2012, after plaintiff had referred to Det. Carroll as a "bully" to other officers, Carroll came to work wearing a hat with the word "bully" on it. Carroll stood near plaintiff's desk and said "I hear I'm a bully" loudly so other officers and supervisors could hear it. (Pl.'s 56.1 Statement ¶ 235). He repeated this at least five times.

Plaintiff emailed Chief Leahy and said he thought Carroll was trying to initiate a confrontation with plaintiff and harass him. Leahy had Lanza investigate the incident.

Lanza's investigation found Carroll had disrupted the workplace in violation of the department's regulations. Leahy took away one of Carroll's vacation days as a punishment, and told Carroll to stay away from plaintiff. Plaintiff contends this was an insignificant punishment as Carroll had accrued many vacation days, and in their department, 10 to 15 days of lost vacation is considered a serious punishment. Plaintiff also claims Carroll should have been disciplined for insubordination and suspended, but was not.

Carroll continued to wear the "bully" hat around town and harass plaintiff, including at a Patrolman's Benevolent Association event attended by plaintiff and Lanza. Carroll admits he is stubborn and continued to wear the hat even though Lanza told him not to wear it.

IV.  The Street Fair Incident

On June 14, 2013, plaintiff and Det. Carroll both attended the Mamaroneck Shares Street Fair. While off duty, Carroll approached plaintiff (who was on duty) and began yelling various taunts and threats at plaintiff, including "you're going to die." (Pl.'s 56.1 Statement ¶¶ 252-54).

Plaintiff sent an email to Chief Leahy and Lt. Falcone on June 16, 2013, saying he felt the department was not taking enough action to stop Carroll's harassment and keep plaintiff safe, which caused plaintiff a lot of stress. Plaintiff also expressed these concerns to Det. Sgt. Lanza.

On June 18, 2013, Lanza interviewed Carroll about the June 14 incident. There is an audio recording of this interview. (Declaration of Amy L. Bellantoni, Ex. 16 ("Bellantoni Decl.")). When Carroll characterized the incident as "we had a few words with each other," Lanza said of plaintiff, "He fucking . . . he sent another memo to the chief."[2] (Id. at 1:30). Carroll reacted angrily and was critical of the department for entertaining plaintiff's complaints, and for punishing Carroll for wearing the "bully" hat. Carroll also said the conflicts between him and plaintiff would not stop until "I see him in the grave one day," but he immediately clarified it would "not [be] by my hand." (Id. at 1:45). Lanza said the conflicts between plaintiff and Carroll were escalating. Carroll gave Lanza the impression Carroll did not believe he was doing anything wrong.

Based on his investigation of the June 14, 2013, incident, Lanza believed plaintiff's safety was possibly in jeopardy, found Carroll violated workplace policy by having a negative impact on department efficiency, and recommended to Leahy that Carroll forfeit three or four vacation days as a punishment.

---

[2]  Plaintiff's brief says Lanza said this "as if accompanied by an 'eye-roll.'" (Pl.'s Br. at 14). This is plaintiff counsel's characterization based on Lanza's tone of voice and is not corroborated by deposition testimony or other evidence.

5

V.    Personnel Complaint Against Plaintiff

Plaintiff's relationship with Mrs. Carroll and her children ended on May 22, 2013, when plaintiff sent Mrs. Carroll a text message disparaging her daughter, and she replied, telling him not to call or text her again.

On July 3, 2013, Det. and Mrs. Carroll met with Lanza to file a personnel complaint against plaintiff. In the meeting, Mrs. Carroll recounted an incident from a year and a half earlier, in which plaintiff went to her house and reprimanded her daughter for not being more respectful to her mother. She also complained plaintiff was repeatedly driving by her house and her children's high school. Lanza declined to interview the daughter as part of the investigation. Lanza admitted in his deposition plaintiff had not violated the law or department policy by speaking to the daughter.

Mrs. Carroll filed the personnel complaint on July 15, 2013. Upon receiving it, Lanza told Mrs. Carroll to include more information so the complaint could be used to prevent plaintiff from contacting both Mrs. Carroll and her children, and to prevent plaintiff from claiming the personnel complaint was retaliation for plaintiff's complaints against Det. Carroll.

Lanza's report found Mrs. Carroll's complaints were "Not Substantiated," meaning the investigation neither proved nor disproved the allegations. (Bellantoni Decl., Ex. 23). Plaintiff was disciplined with a "Letter of Expectation" and was ordered to stay away from Mrs. Carroll and her children. Leahy reassigned plaintiff to a different post so plaintiff's work would not bring him close to Mrs. Carroll's house, the children's school, or the daughter's work place, per Det. Carroll's request. In his deposition, Lanza testified the decision to reassign plaintiff was also because plaintiff's May 22, 2013, text message had upset Mrs. Carroll.

VI.  Det. Carroll Outside Plaintiff's House

On August 2, 2013, Chief Leahy told Det. Carroll he could face formal discipline or else lose two days of vacation time for his role in the June 14, 2013, street fair incident. See supra Part IV.  Later that day, Carroll drove to plaintiff's house and sat outside in his car.  He did so again on August 4, 2013.

Plaintiff complained to both the police department and the Westchester County District Attorney's Office.  On August 7, 2013, Leahy placed Carroll on modified duty and took away his gun.

Based on this incident, Carroll was charged with harassment in the second degree—a non-criminal violation—in Village of Mamaroneck Justice Court.  Plaintiff contends Lanza influenced the decision not to charge Carroll with stalking, a misdemeanor.  Lanza did not turn over to the DA's office any of the taped recordings of conversations with Carroll, and testified in Carroll's defense at his bench trial on the harassment charge.  Carroll was acquitted.[3]

As punishment for both the June 14 street fair incident and the August 2-4 harassment charge, Leahy took away three of Carroll's vacation days.

VII.  Other Allegations

Plaintiff also contends Det. Carroll has threatened and harassed other police officers, yet Leahy has taken no steps to reprimand him for those incidents.  Additionally, plaintiff points to two disciplinary actions taken against other officers that were harsher than those against Carroll as evidence Carroll's punishments were particularly light.  (Pl.'s 56.1 Statement ¶¶ 364, 367).

---

[3]  The trial was held in White Plains City Court, and was presided over by a White Plains City Court judge, who described plaintiff's and Carroll's behavior as "juvenile" and "embarrassing."  (Defendant's Local Rule 56.1 Statement of Material Facts Not in Dispute ¶ 151).

7

Plaintiff missed four months of work due to stress and anxiety from his interactions with Carroll.

**DISCUSSION**

I.   Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  See id.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."

Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II.   Substantive Due Process

"[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989). Thus, a government actor's "failure to protect an individual against private violence [] does not constitute a violation of the Due Process Clause." Id. at 197. There are, however, two exceptions to this general rule: the "special relationship" exception, and the "state-created danger" exception. See Matican v. City of New York, 524 F.3d 151, 155 (2d Cir. 2008), cert. denied, 555 U.S. 1047 (2008). Plaintiff alleges the latter exception applies here.

9

A.      "State-Created Danger" Exception

The Second Circuit has held, as an exception to the general rule set forth in DeShaney, government officials "infringe a victim's due process rights when [they] assist in creating or increasing the danger that the victim faced at the hands of a third party." Matican v. City of New York, 524 F.3d at 157 (citing Dwares v. City of New York, 985 F.2d 94, 99 (2d Cir. 1993)). Thus, under the "state-created danger" exception, government officials may be held liable for private harms if their "affirmative conduct . . . communicates, explicitly or implicitly, official sanction of private violence." Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 429 (2d Cir. 2009).

Law enforcement officers can explicitly sanction private violence by telling the private actor he can be violent without consequence. See, e.g., Snider v. Dylag, 188 F.3d 51, 55 (2d Cir. 1999) (prison guard told inmates it was "open season" on a prisoner, and the inmates beat the prisoner); Dwares v. City of New York, 985 F.2d at 99 (police officers told skinheads they would not prevent them from beating up protesters in a park).

Law enforcement officers can also implicitly sanction private violence if their affirmative conduct signals to the private actor he will not be punished. For example, police officers affirmatively encouraged domestic violence when (i) while responding to the victim's call alleging she had been beaten, discussed football with the perpetrator and were dismissive of the victim in front of the perpetrator; (ii) did not arrest the perpetrator even though he told them he "could not 'help it sometimes when he smacks [the victim] around;'" and (iii) responded to several similar complaints made by the victim without filing a domestic incident report or interviewing the perpetrator. Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d at

429-30.  These behaviors "repeatedly communicated" to the perpetrator "that his violence would go unpunished."  Id. at 430.

Similarly, police officers implicitly but affirmatively encouraged an off-duty officer's drunk driving when they drank with him in the precinct parking lot and at a bar, and his sergeant asked him for a ride from the precinct to the bar and back.  Pena v. DePrisco, 432 F.3d 98, 110-11 (2d Cir. 2005).  This behavior communicated to the driver he would not "be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others."  Id. at 111.

By contrast, failure to intervene does not by itself implicitly sanction private violence.  See, e.g., Pitchell v. Callan, 13 F.3d 545, 549 (2d Cir.1994) (no substantive due process violation when police officer failed to intervene to prevent a colleague from shooting someone during a private altercation).  For this reason, "'allegations that the defendant officers merely stood by and did nothing' are insufficient to state a constitutional violation."  Pena v. DePrisco, 432 F.3d at 110 (quoting Dwares v. City of New York, 985 F.2d at 99).

When a plaintiff alleges a defendant implicitly sanctioned private violence largely through repeated inaction, a plaintiff must show the defendant's failure to act was itself communicated to the private actor.  See Chambers v. N. Rockland Cent. Sch. Dist., 815 F. Supp. 2d 753, 767 (S.D.N.Y. 2011).  "Such communication is, in fact, a necessary prerequisite to 'condoning' such conduct."  Bunn v. City of Poughkeepsie, 2012 WL 1621563, at *5 (S.D.N.Y. May 9, 2012).  Moreover, the communication must be "deliberate," that is, a defendant must have intended for his inaction to signal his approval of the violence.  See S.W. ex rel. Marquis-Abrams v. City of New York, 46 F. Supp. 3d 176, 205 (E.D.N.Y. 2014) (no substantive due process violation where there was no evidence "defendants intended by their incompetence to

11

communicate to [the private actor] that she could abuse the children in her custody at will"); see also Pena v. DePrisco, 432 F.3d at 112 ("Sometimes deliberate silence is equivalent to explicit permission.") (emphasis added).

B.      "Shocks the Conscience"

Substantive due process claims also require a plaintiff to show the government official's behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d at 431 (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).  This is to prevent the undue expansion of an area of law in which "guideposts for responsible decisionmaking . . . are scarce and open-ended." Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992).

A claim is "most likely to rise to the conscience-shocking level" if the official intentionally harms the plaintiff.  Cty. of Sacramento v. Lewis, 523 U.S. at 849.  On the other hand, "negligently inflected harm is categorically beneath the threshold of constitutional due process." Id.  "Recklessly inflicted harms are context-dependent 'closer calls.'" Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d at 431 (quoting Cty. of Sacramento v. Lewis, 523 U.S. at 849).

Recklessly inflicted harm is less likely to shock the conscience if the defendant official was subject to the "pull of competing obligations." Lombardi v. Whitman, 485 F.3d 73, 83 (2d Cir. 2007) (Environmental Protection Agency officials' misrepresentation of air quality at Ground Zero clean-up site did not shock the conscience because of the competing obligations to "avoid panic, keep order, restore services, repair infrastructure, and preserve the economy"); see Matican v. City of New York, 524 F.3d at 159 (police officers' conduct did not shock the

conscience when they executed a sting operation in a way that endangered their informant because of the competing obligation of protecting officer safety).

III.     Plaintiff's Claim

Plaintiff's sole theory in support of a substantive due process violation is that defendants' mishandling of plaintiff's complaints against Det. Carroll implicitly condoned Carroll's behavior, increasing the risk he would commit private violence against plaintiff.

Summary judgment is warranted in this case because, as a matter of law, almost none of defendants' conduct affirmatively encouraged Det. Carroll's behavior; and to the extent it did, such conduct does not "shock the conscience."

    A.     Affirmative Encouragement

First, irrespective of whether defendants handled plaintiff's complaints against Det. Carroll poorly, mere inaction or insufficient action is not enough to support plaintiff's claim. See Pitchell v. Callan, 13 F.3d at 549.  Therefore, simply failing to charge Carroll with a crime or imposing an overly lenient punishment, without more, does not constitute a substantive due process violation.

Second, to the extent defendants' affirmative behavior was not communicated to Carroll, it does not support plaintiff's claim.  See Chambers v. N. Rockland Cent. Sch. Dist., 815 F. Supp. 2d at 767.  Accordingly, defendants' alleged failure to inform plaintiff of the status of their investigations into Carroll; dismissive attitudes toward plaintiff outside of Carroll's presence; failure to collect or disclose evidence of Carroll's wrongdoing; and re-assignment of the September 1, 2012, incident report to an officer other than Officer Scarborough, cannot have communicated any implicit approval of Carroll's actions to Carroll himself.

Third, some of defendants' actions or inactions that <u>were</u> known to Carroll did not <u>deliberately</u> communicate implicit approval of Carroll's actions.  See <u>S.W. ex rel. Marquis-Abrams v. City of New York</u>, 46 F. Supp. 3d at 205.  For example, it is hard to see how the designation of plaintiff and Carroll as "mutual combatants" in the September 1, 2012, incident report deliberately communicated anything.  Indeed, a police report calling a violent actor a "combatant" is hardly an endorsement of his behavior.  Likewise, to the extent Chief Leahy's short meeting, in which he told plaintiff and Carroll to stay away from each other, could have signaled to Carroll that he would not be punished, no reasonable jury could find such a message was intentional.

Perhaps a reasonable jury could infer Lanza's remark to Carroll on June 18, 2013, "[h]e fucking . . . he sent another memo to the chief," was intended to signal to Carroll that defendants were not taking plaintiff's complaints seriously.  (<u>See</u> Bellantoni Decl., Ex. 16).  But taken in the context of a larger conversation, in which Lanza expressed concern for the escalating conflict between plaintiff and Carroll, this one "scintilla" of evidence is insufficient to defeat a motion for summary judgment.  <u>See</u> <u>Dawson v. Cty. of Westchester</u>, 373 F.3d at 272.

B. <u>Shocks the Conscience</u>

Plaintiff also attempts to support his substantive due process claim by pointing to (i) defendants' disproportionately harsh discipline of plaintiff based on Mrs. Carroll's personnel complaints, compared to their discipline of Det. Carroll; and (ii) Lanza testifying for Carroll during Carroll's harassment trial.

However, even assuming either of these actions deliberately communicated implicit approval of Det. Carroll's actions, neither one shocks the conscience.  This is because in both

instances, defendants were subject to the "pull of competing obligations." Lombardi v. Whitman, 485 F.3d at 83.

In July 2013, Mrs. Carroll told defendants plaintiff was stalking her and her children. Defendants reacted by assisting Mrs. Carroll in the drafting of her personnel complaint, reprimanding plaintiff, and reassigning him to a different post, where he would no longer be in contact with them.  Even if this did put plaintiff in greater danger by signaling to Det. Carroll that defendants took his and Mrs. Carroll's complaints about plaintiff more seriously than they took plaintiff's complaints about Det. Carroll, in doing so, defendants had to balance the risk of putting plaintiff in greater danger with their obligation to protect members of the public from a perceived threat.

Likewise, Lanza was subject to the "pull of competing obligations" when he testified for the defense at Det. Carroll's trial.  Even if his testimony communicated implicit encouragement of Carroll's behavior, it was given under an obligation to testify truthfully and completely at a trial.

Because neither action shocks the conscience, neither can be used to create a material fact as to whether plaintiff's substantive due process rights were violated.

C.     Plaintiff's Additional Arguments

In addition to those addressed above, plaintiff makes several arguments in opposition to the motion.  None is persuasive.

Plaintiff likens this case to Okin v. Village of Cornwall-On-Hudson Police Department, insofar as defendants' seemingly indifferent investigation affirmatively encouraged Det. Carroll to continue to harass plaintiff.  (Pl.'s Br. at 10-12).

But no defendant here displayed nearly as much indifference toward Det. Carroll's threatening behavior as the officers in <u>Okin</u>, who chatted about sports with a domestic violence perpetrator in front of his victim and ignored the perpetrator's admissions about hitting her.  577 F.3d at 429-30.  The defendants here, all parties agree, investigated all four incidents, and disciplined Carroll for his role in three of them.  <u>Okin</u> is clearly distinguishable.

Nor is it persuasive that Det. Carroll continued to harass plaintiff despite defendants' attempts to discipline him.  (Pl.'s Br. at 13-14, 16-17).  However badly this reflects on Carroll, defendants' inability to persuade Carroll to stop merely reflects a passive failure to protect plaintiff because plaintiff cannot show defendants deliberately, if implicitly, <u>encouraged</u> Carroll.  That is not actionable as a substantive due process violation.

    D.    <u>Qualified Immunity</u>

Because the Court grants summary judgment on the ground that no constitutional violation occurred, it need not address the parties' qualified immunity arguments.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED.

The Clerk is instructed to terminate the motion (Doc. #43) and close the case.

Dated: February 22, 2016
       White Plains, NY

SO ORDERED:

_/s/ Vincent L. Briccetti_
Vincent L. Briccetti
United States District Judge